[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. NATURE OF PROCEEDINGS
By petitions dated March 4, 1991, as clarified by amendments granted on July 29, 1991, the Commissioner of the CT Page 1094 Department of Children and Youth Services, hereinafter known as DCYS or as the Petitioner, seeks termination of the parental rights of Gary S., Father, in and to Christopher S., born October 23, 1980, and Gregory S., born January 5, 1983, pursuant to Conn. Gen. Statutes, Section 17a-112, claiming three grounds:
1. Failure to Rehabilitate — Section 17a-112(b)(2)
2. Acts of Commission or Omission — Section 17a-112(b)(3)
3. No Ongoing Parent/Child Relationship — Section 17a-112(b)(4)
The Petitioner further alleges that all three claimed grounds have existed for not less than one year.
Service was found on Father (Mother died in 1983), and he appeared through counsel. Trial began on July 29, 1991, and testimony was taken on July 29, 30, 31, August 7, October 29 and 30, 1991.
II. PROCEEDINGS PRIOR TO FILING OF THESE PETITIONS
On December 2, 1988, the Court ordered that temporary custody of both boys be given to DCYS. On January 12, 1989, the Court adjudicated both children neglected, and they were returned to Father under an order of Protective Supervision. He was encouraged by the Court to seek alcohol treatment, and the Court ordered that an in-court review of the case take place in six months.
On March 17, 1989, an alcohol-related incident occurred which resulted in DCYS obtaining a 96 hour hold on both boys. On March 20, 1989, the Court awarded temporary custody to DCYS and on the same day, the Petitioner filed a Motion to Reopen and Modify the Disposition of January 12, 1989, which had returned the children to Father under an Order of Protective Supervision; seeking commitment to DCYS for a period not to exceed eighteen months. On March 31, 1989, the Court granted this Motion, and the children were committed to DCYS for up to eighteen months. On August 3, 1990, this commitment was extended by the Court for an additional period of up to eighteen months, to March 31, 1992.
III. WITNESSES AND EXHIBITS
A. Witnesses
The Petitioner called the following witnesses: CT Page 1095
 1. Diane H. Schetky, M.D. 2. Lawrence Ash-Morgan, Ph.D. 3. Stanley Kasanowski, DCYS 4. Judith Johns, Foster Mother 5. Frank Anastasio, Therapist 6. Leslie Jellison, DCYS 7. Sherry Rautenberg, DCYS 8. Horace Behrli, Conn. State Policeman 9. David M. Mantell, Ph.D.
The Respondent called the following witnesses:
 1. Himself, Gary Stager 2. Lucille Vallieres 3. Sherry Rautenberg, DCYS 4. Francis Stager
The Petitioner called as a rebuttal witness:
1. Russell Stevens, Conn. State Policeman
The Respondent called as a surrebuttal witness:
1. Himself, Gary Stager
B. Exhibits
The Petitioner introduced 23 full exhibits and 7 exhibits for identification. The children introduced 5 full exhibits and the Respondent introduced 1 full exhibit.
IV. FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children, of which the court takes judicial notice, causes the Court to find the following facts:
Christopher S. was born October 23, 1980, and Gregory S. on January 5, 1983. Gregory was born two months early because of his Mother's illness, which resulted in her death about a week after delivery. Gregory remained in the hospital for ten months because of serious difficulties arising from his early birth. He suffered scarring of his lungs and a permanent, severe loss of vision in both eyes, and upon discharge from the hospital in November, 1983, he lived with a maternal aunt for about a year, when he returned to Father's house, who remarried in 1985. In December 1988, orders of Temporary Custody were granted to DCYS, based on affidavits that on November 25, 1988, Gary Stager, appearing to be intoxicated, was in his house CT Page 1096 with his son, Christopher, age 8, with a rifle and box of shells on the couch, without anyone there to supervise Chris other than Gary.
On January 12, 1989, when the boys were adjudicated as neglected and returned to Gary under an order of Protective Supervision, he was encouraged by the Court to seek alcohol treatment.
However, about nine weeks later, on March 17, 1989, Father, while intoxicated, forcibly took the boys from the care of his married sister, assaulting her in the process, and later the same day was arrested and charged by the Conn. State Police with Operating Under the Influence, Assault, Operating Without a License and Evading Responsibility. Both children were with his while he was driving. (Summary of facts In Support of Motion To Reopen and Modify Disposition March 20, 1989) (Social Study, March 30, 1989).
On March 27, 1989, Mr. Stager entered Blue Ridge Center of Bloomfield for an alcohol treatment program while the DWI charges were pending, and the children were placed in a DCYS licensed foster home in Enfield, Conn. (Social Study, March 30, 1989).
On March 31, 1989, the children were committed to DCYS and placed with their maternal grandfather and his wife in Maine. Father was discharged from Blue Ridge on April 21, 1989, but on July 8, 1989, while visiting the boys in Islesboro, Maine, he was arrested for operating a motor vehicle while under the influence, and for operating a motor vehicle while under suspension. The police pulled his vehicle over after receiving several complaints of a red, cherry Camaro driving recklessly around the island. He was driving a red Camaro with Connecticut plates. A chemical analysis of his breath showed an amount of alcohol corresponding to 0.27% by weight (Petitioner's Exhibit 9).
Stan Kasanowski, DCYS Social Worker, received the Stager case in January 1989, and remained involved until September 1990. DCYS asked Father many times to verify alcohol treatment, because the goal of DCYS was to reunify the children with him if he could resolve his alcohol problem. He refused to document attendance or participation in the Blue Ridge Support group. Finally he gave Mr. Kasanowski two names; when Mr. Kasanowski called them, one said he wasn't in touch with Gary, and the other telephone number was not a working number. In March 1990, Gary was in the Beech Hill Treatment Center in New Hampshire. In August and early September 1990, Gary gave Mr. Kasanowski some AA sponsor's names. Mr. Kasanowski CT Page 1097 contacted these people; Gary had started to go to AA, but one person said Gary hadn't been sober for the past month, and all others said he needed more intensive treatment than AA. When Mr. Kasanowski asked Gary about this, he denied drinking, as he did continually while Mr. Kasanowski worked on the case. On August 31, 1990, Gary called Mr. Kasanowski in a highly intoxicated condition, and was abusive and threatening to the point that Mr. Kasanowski terminated the call. (Testimony of Stan Kasanowski).
On August 23, 1989, Father signed "Expectations" most of which he didn't comply with, even though this document states:
 "If you fulfill the court's expectations you will improve your chances of regaining, or keeping, guardianship of your child permanently. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption." (Pet's Ex. #16)
Father didn't comply with these expectations in that he didn't keep all appointments set by or with DCYS, didn't visit the children as often as DCYS permits, only participated in counseling sometimes and did not document attendance at thrice weekly AA meetings. A Service Agreement (Children's Ex. B) was handed to Father at his home, covering the period of February 1, 1989 to July 1, 1989. He said he would review it with his attorney and get back to Mr. Kasanowski. He returned it signed, with changes, which DCYS would not accept, because references to alcohol had been omitted. Alcohol abuse was the reason for the orders of Temporary Custody and for the Commitment of the children in 1988 and 1989. Stan Kasanowski observed Father in the DCYS building when he had been drinking, and received information on at least four occasions that he was drinking. He confronted Father ten or more times about his drinking and its effect on his children, and still he continually denied drinking, except for the time he was arrested for DWI in Maine. At a treatment review of the case in April 1990, the goal of DCYS was still reunification, but the Department was concerned about Father's unsatisfactory progress, and therefore told him that the boys need stability, and that without sufficient progress and improvement, he may face Termination of Parental Rights Petitions. (Testimony of S. Kasanowski).
The children were returned from Maine to the foster home of Judith Johns R.N. in Conn. on August 28, 1990, at Father's request (testimony of S. Kasanowski). Mrs. Johns met with Father on September 12, 1990, when it was established that CT Page 1098 beginning in October 1990, there would be weekly visits at the Johns house. On September 24, 1990, Greg was in the hospital for an eye problem. When Father came to visit, Mrs. Johns smelled alcohol and he appeared to be drunk. When she said he shouldn't be visiting, he said I'm visiting if I have to tear the hospital gown. Greg was very tense and said that his father was drunk, wasn't he, and he spoke to his nurse about it. On September 30, 1990, Father admitted to Mrs. Johns he had been drinking, and when she said Greg was upset, he laughed. On October 12, 1990, Father called Mrs. Johns and said he couldn't come for his visit because he was drinking. Father arrived drunk for a visit at the Johns house the Tuesday before Thanksgiving. His voice was slurred, he was very obnoxious and rude, and Mrs. Johns could not follow his sentences. Mrs. Johns told his Chris was in counselling. Chris who was ten years old, said his father whispered to his that counselors are fucking shitheads, and that the Johns are a bunch of fucking assholes, and that he'll get Chris out of there. After the visits of October and November 1990, the boys said they got very upset when they knew their father was coming to visit.
Greg objected to Father visiting after the drunken November 1990 visit, and Chris objected at the end of January 1991, when he realized he had a choice. (Testimony of Judith Johns).
Frank Anastasio, a therapist for eighteen years, started seeing Chris weekly in late October, 1990. In November 1990, Chris told his he didn't want to see his father because afterwards he couldn't sleep or do well in school and was anxious. Three or four times in December 1990, Chris mentioned stopping visits. In January, Chris consistently chose not to visit. As of the date the Termination Petition was filed, March 4, 1991, according to Mr. Anastasio, there was no parent/child relationship between Chris and his father as that term is defined in the applicable Connecticut Statute, and that to allow more time for that relationship to develop would be detrimental to Chris; he has been in Limbo a long time and he needs predictability. From the time Chris became Mr. Anastasio's patient on November 21, 1990, he told Mr. Anastasio that he didn't want to see his father because he thought this would affect his behavior at house and in school. Mr. Anastasio also testified that it would be a long time before the parent/child relationship between Chris and his father could be rehabilitated and that Chris cannot afford emotionally to wait until his father gets his life together, that he's afraid of the future, and needs to be settled and relaxed with the consistency that permanency would provide. (Testimony of Frank Anastasio). CT Page 1099
Dr. Lawrence Ash-Morgan, Senior Psychologist at United Services since 1982, first met Greg as his therapist on January 21, 1991. The presenting issues were Father's drinking and loss of Greg's mother through death, and his stepmother through divorce. Greg showed a lot of anger in his non-directed play, very specifically this anger was directed at his father, but Greg felt OK about this because he felt that Gary couldn't care for him because of his alcohol abuse. Dr. Ash-Morgan testified that at his intake visit with Greg on December 5, 1990, it was indicated that Greg was wetting his bed after visits from Father, that he wanted to see Father more than once a month and that he said Father is usually drunk at visits. Dr. Ash-Morgan believes alcohol abuse by a parent has a long term effect on children, and although he didn't have a strong opinion on the existence of a parent/child relationship, Greg is vulnerable, has no solid basis of security, and needs safety and stability. Prior to Greg hearing about the Termination Petition on January 29, 1991, he had some relationship with his father. In early February, 1991, Greg said termination of his father's parental rights was all right with his (Greg), because Father couldn't take care of his because of his drinking. (Testimony of Dr. Ash-Morgan).
Leslie Jellison, DCYS Social Worker, who has worked three and a half years as a Youth Counselor, and two years as a treatment worker at DCYS, took over this case in late September 1990, at which time DCYS's goal was still reunification. She met Gary on October 3, 1990, and told him of the reunification goal, but that he would have to stop drinking. On September 28, 1990 Mrs. Johns, foster mother, told Ms. Jellison that Gary had come to the hospital drunk, but in early October, he denied this to Ms. Jellison. Father never admitted to her that he had an alcohol problem, and although he told her he was going to AA, he refused to give her his sponsor's name. Father and Leslie Jellison signed a Visitation Agreement covering the period November 23, 1990 to January 1, 1991, in which Father agreed "During or before visits father will not have any alcoholic beverage," and "Father will enter D/A treatment in or outpatient, but will NOT drink." This agreement also provided that "The department will consider terminating Mr. Stager's Parental Rights if the alcohol issue and behaviors don't change." (Pet's Ex. #19). Four days after the effective date of this Agreement, Ms. Jellison was present at Father's visit (November 27, 1990), and Father smelled of alcohol, was very argumentative, he told Chris that therapy was no good, he was profane, and according to what Chris told Ms. Jellison, whispered to Chris that DCYS was a bunch of fucking assholes. Greg and Chris told Ms. Jellison that Father had been drinking at that visit. Ms. Jellison smelled alcohol on Father's breath CT Page 1100 at the Treatment Plan review on October 9, 1990, also at a Case Status Conference on October 26, 1990, when she was sitting across the table from him and in a telephone conversation with her on October 24, 1990, he was belligerent and slurring his words. DCYS's decision to seek Termination of Parental Rights was based on Father's denial of a drinking problem, his not seeking help, his continuing to drink, and the fact that the boys were fearful; so reunification no longer seemed to be a reasonable goal. (Testimony of Leslie Jellison).
On November 9, 1990, Sherry Rautenberg, DCYS Social Worker, answered the phone and spoke to Father in Leslie Jellison's absence. During this conversation, Father was verbally abusive, slurred his words, would say one or two words, then stop, said three times that Leslie J. was a drunk, was very angry, his thoughts were disjointed and he kept repeating himself. On October 26, 1990 Father signed "Expectations", which again called for no alcohol abuse. (Pet's Ex. #25). (Testimony of Sherry Rautenberg).
On November 6, 1990, Father telephoned his sons at the Johns foster home and stated to Chris "that fucking State of Connecticut would not allow them to visit their dying grandmother, they are fucking jerks and the foster parents are assholes". This was very upsetting to Christopher as he is not used to that type of language, and the children were not aware that their grandmother was terminally ill. (January 23, 1991 Soc. Study, Page 16).
On January 14, 1991, at about 10 P.M., the Conn. State Police were called to investigate a complaint at 113 Diamond Ledge Road, Stafford, CT. They observed Gary swearing and yelling at the occupants inside the house, and Gary began punching and kicking the front door. He was extremely intoxicated and was placed under arrest. (Pet's Exh. #23)
On February 20, 1991, at about 5 P.M., the Connecticut State Police were called to Father's residence where he lives with his father and his brother. Gary, who was highly intoxicated, had struck his brother in the nose with the back of his right fist, breaking his nose. At about 9:30 P.M., the Police arrested Father, who was extremely intoxicated. (Pet's Ex. #24).
V. TESTIMONY OF EXPERT WITNESSES (Dr. Schetky and Dr. Mantell)
1. Dr. Diane Schetky
Dr. Diane H. Schetky, a Board Certified Child Psychiatrist, who has worked since 1972 as a child CT Page 1101 psychiatrist, and has written four books on child psychiatry and the law, first met the children in July, 1989, in Maine, when they were being cared for by their maternal grandfather and his wife. She immediately started seeing Chris about once a week. She started seeing Greg in November 1989, at his request, and in January 1990 started seeing both boys together until they returned to Connecticut in August 1990. She met with Father in September 1989, obtained a history from him and observed his interaction with the children.
Dr. Schetky sent three reports to Connecticut DCYS (Pet's Ex. 1, 2 and 3), covering reports of September 5 and interview of September 19, 1989, report of February 19, 1990, and report of May 28, 1990. In her report of May 28, 1990, (Pet's Ex. 3), Dr. Shetky concluded on Page 2:
 "Given the fact that he's only had a few months of sobriety, I feel that he still has a long way to go before he is able to care for his sons. I have major concerns about his ability to parent which go beyond his alcoholism. These are based upon 1) his lack of psychological mindedness and his great difficulty communicating with his children; 2) His partiality toward Chris and tendency to ignore Greg; 3) His tendencies toward impulsivity, violence and paranoid thinking which in the past have prevented him from acting in the best interests of the children; 4) Repeated patterns of behavior that demonstrate poor judgment.
 As I stressed in my previous report of February 19, 1990, Chris and Greg need permanency. I would recommend moving toward termination of parental rights unless there is substantial change in Gary's level of functioning over the next 6 months. Given the extent of his characterological problems, I think this sort of change is doubtful."
2. Dr. David Mantell, PH.D
Dr. Mantell, a licensed clinical psychologist, saw Father and children in September 1990, and children and Foster Mother in October 1990. In his report dated October 25, 1990, on Page 9, Dr. Mantell states:
 "The impression is that the father is not on the road to rehabilitation and that his impact upon his children is a disturbing rather than a comforting one." CT Page 1102
On Page 8, Dr. Mantell says:
 "He does not appear able to stay away from alcohol on his own. He needs a proper rehabilitation." (Pet's Ex. 4)
Dr. Mantell's recommendation in October 1990 was sobriety. (Testimony of Dr. Mantell).
VI. LAW AND STANDARD OF PROOF IN TERMINATION OF PARENTAL RIGHTS CASE
The termination of parental rights involves two phases: adjudication and disposition. Practice Book 1049, 1042, 1044. At first the court determines whether one or more statutory grounds have been proven. See e.g. In Re Juvenile Appeal (84-AB), 192 Conn. 254, 262 (1984); In Re Nicolina T.,9 Conn. App. 598, 602 (1987). A finding that statutory grounds exist must be made by proof of facts existing on the date the petition was filed or amended. In Re Luke G., 40 Conn. Sup. 316,323 (1985). Without such a finding, no inquiry may be made as to the ultimate best interest of the child. In Re Juvenile Appeal (Docket No. 10718), 188 Conn. 259, 262-63
(1982); Accord. In Re Luke G., supra; In Re Shannon S.,41 Conn. Sup. 145, 146 (1989).
The standard of proof mandated by Conn. Gen. Stat.17a-112 and Practice Book 1049 is "clear and convincing evidence." This constitutionally mandated standard, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599c(1982), has been observed by our courts. See e.g. In Re Juvenile Appeal (83-CD), 189 Conn. 276, 296 (1983); In Re Juvenile Appeal (84-3), 1 Conn. App. 463 (1984).
VII. ADJUDICATION (Based on facts as of March 4, 1991)
The Petition of March 4, 1991 as amended, alleges three grounds for termination, only one of which need be found for the Court to grant the Petition; In Re Nicolina T., 9 Conn. App. 598,602 (1987). Any of these grounds must have existed for at least one year unless a waiver is alleged and found pursuant to Conn. General Stat. 17a-112(c).
A. Failure to Rehabilitate
This ground is defined in Conn. Gen. Stat. 17a-112(b)(2) as follows:
"The parents of a child who has been found by CT Page 1103 the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and the needs of the child, they could assume a responsible position in the life of the child."
These children were adjudicated neglected on January 12, 1989, at which time the Court advised Father to seek alcohol treatment. On March 31, 1989, because of an alcohol related incident which occurred on March 17, 1989, the children were committed to DCYS and the commitment was extended to March 31, 1992.
The record in this case, and the facts expressly found earlier in this Memorandum of Decision, constitute clear and convincing evidence and proof that Gary Stager had not, as of March 4, 1991, achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, he could assume a responsible position in the life of his children. He was no nearer to being able to provide a suitable house for the boys than when they were first committed nearly two years before.
The issue here is not whether Gary Stager loves his children, or whether he tried to solve his drinking problem, or whether he wants to solve that problem. The issue is rather, has he achieved a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, he could assume a reasonable position in this life. The record is replete with repeated instances of Father's drinking to excess from the time of the January 12, 1989 neglect adjudication up until the filing of this Petition on March 4, 1991. The court finds that the sad fact of the matter is that Father has not been able to stop drinking. This is the junction where his rights and those to his children collide. He does not "own" his children, nor are their rights subordinate to his. They have their own rights, which are independent of, and separate from his. Public policy and the law require that their rights and his, and their mutual interest in preserving the family unit, be accommodated and reconciled as long as that preservation attempt does not infringe upon the the rights of the children to have their father rehabilitate himself to the point where he can occupy a responsible position in their life. Father had the opportunity to do so, but unfortunately has been unable to do so. The possibility that some day he may be able to stop excessive drinking is not enough. CT Page 1104
The Court finds that the Petitioner has clearly and convincingly proved the Failure to Rehabilitate ground and that it has existed for not less than one year as of March 4, 1991.
B. Acts of Commission or Omission
This ground is defined in Conn. General Stat. Section17a-112(b)(3) as follows:
 "The child has been denied, by reason of an act of parental commission or omission the care, guidance or control necessary for his physical, educational, moral or emotional well-being."
From the date the Petitioner obtained temporary custody of the boys on March 20, 1989, until March 4, 1991, the date of this Petition, a period of approximately two years, Father did not have custody of them. It is clear that Father's drinking during this period, and his behavior in the presence of the children when he has been drinking, has adversely affected them, and has impaired their relationship with his. However, the Petitioner has not proved by clear and convincing evidence that this conduct of Father's has resulted in the boys being denied the care, guidance or control necessary for their physical, educational, moral or emotional well-being. This ground is therefore dismissed.
C. No Ongoing Parent/Child Relationship
This ground for termination is defined in Conn. Gen. Stat. Section 17a-112(b)(4) as follows:
 "The relationship that ordinarily develops as a a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child."
There clearly has been contact between Father and the boys since the commitment on March 31, 1989 but that "does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year. In Re Juvenile Appeal, (Anonymous), 181 Conn. 638, 646 (1980)."
Dr. Schetky, who saw the boys until August 1990, and who CT Page 1105 had seen Father in September 1989, and had frequent phone conversations with him thereafter, testified that Greg and his father had no parent-child relationship as that term is defined in Conn. Gen. Stat. Sections 12a-112(b)(4), and that no further time should be allowed for it to be reestablished because Greg had had many placements already, that he wants to reach out, that he'll become angry and disillusioned if made to wait.
Dr. Schetky further testified that Chris and Father had only a fanciful parent-child relationship, that Father has a lifetime pattern of maladaptive behavior, denial, swings, blaming others, and poor motivation for change because he sees himself as a victim, Dr. Schetky also said that the children are suffering from a lack of permanency and their ability to trust is being impaired, that they can't afford any more time; they need permanency, stability and to know that someone will be there.
Dr. Ash-Morgan, Greg's therapist testified that at about the time the Termination of Parental Rights Petitions were filed, Greg said that he didn't want to visit Father, that he was scared by his drinking, that his Father ruins his life, and that he thought about negative things for several days after Father's visits.
Frank Anastasio, Chris' therapist, testified that as of March 4, 1991, Chris and Father had no parent/child relationship as defined by the statute; and that to allow any more time would be detrimental, that Chris has been in Limbo a long time, that it would take a long time for their relationship to be rehabilitated, that he can't afford emotionally to wait until Father might get his life together, that Chris is afraid of the future and that he needs the consistency that permanency would afford.
 "The psychological testimony from professionals is rightly accorded great weight in termination proceedings" In Re Nicolina T., 9 Conn. App. 598, 605 F(1987).
The Court finds that the Petitioner has proved by clear and convincing evidence that on March 4, 1991 there was no ongoing parent/child relationship as defined above, and that to allow further time for the establishment or reestablishment of such relationship would be detrimental to the best interest o the children. The Court further finds that this ground has existed for not less than one year, and that even if it had been less than one year, the totality of the circumstances surrounding these children demand a waiver of this requirement in order to promote the best interests of the children. CT Page 1106
VIII. ADDITIONAL FACTS (As of October 30, 1991, last day of trial). For use in dispositional Phase only.
Father was drinking on the following dates: April 8, 1991 (telephone call to Sherry Rautenberg of DCYS), June 27, 1991 (at case conference), October 10, 1991 (Greg said alcohol on Father's breath at visit), October 24, 1991 (Chris said alcohol on Father's breath at visit and also smelled by S. Rautenberg).
After Greg's recent (recent as of October 29, 1991) visits, he told his foster mother and Sherry Rautenberg that he doesn't want to see his father because he drinks, and Chris said on October 24, 1991 that he hopes his father loses this case; that he's a drunk, and that he doesn't want to return home. (Testimony of Sherry Rautenberg).
On September 7, 1991, at approximately 11 A.M., Father's girlfriend, Lucille Vallieres called the hospital because she thought he had drunk rubbing alcohol; he looked different, he was asleep and pushing him had no effect. He denied drinking anything. (Testimony of Lucille Vallieres.)
Trooper Russell Stevens investigated this incident of September 7, 1991, and testified that Gary could hardly stand up and was obviously intoxicated; his eyes were bloodshot, glassy; he had a strong odor of alcohol, was swaying, and threatened another policeman and Trooper Stevens and their families. Trooper Stevens saw an empty plastic bottle of rubbing alcohol, so he sent Gary to the hospital. (Testimony of Trooper Russell Stevens).
When Thomas Fortuna, an Emergency Medical Technician, arrived at the scene on September 7, 1991, with an ambulance, he found that Gary was extremely intoxicated, refused to be treated and threatened the use of a knife that was in his pocket. Father went out the second floor window and ran toward Main Street (Stafford). He was found crouching behind two trucks and could hardly stand up. He was asked to go to the hospital, to which his response was "Fuck the state police, I don't need any fucking help, leave me the fuck alone". When brought to the barracks he was unable to be processed because of his level of intoxication. (Pet's Ex. #28).
Gary Stager's version of this incident was that he slipped out of his girlfriend's house unnoticed, bought a one pint bottle of vodka, had four of five drinks between 8:30 A.M. and 11:00 A.M., and hid the bottle in the bushes with about one inch of vodka left. (Testimony of Gary Stager). CT Page 1107
On October 30, 1991, Father testified that he hadn't had a drink since January 1991 although he later admitted being drunk on February 20, 1991, that he was arrested for DWI in 1986 or 1987, at which time he was placed in the Alcohol Education Program; again in early 1988 for DWI, when he lost his driver's license for two years; again in 1989 for DWI when the boys were riding with him, for which he served 30 days in jail and lost his license for three years; and again in July of 1989 in Maine, when his reading was .027%. He admitted drinking for about a month before his arrest in January 1991, and said of the September 7, 1991 incident at his girlfriend's that he wasn't intoxicated and went out the window because the emergency medical technician wanted him to go to the hospital for nothing. Gary denied having drunk before visiting Greg in the hospital in September 1990, saying his breath smelled of cough syrup. He further testified that he did tell Judy Johns that he had a glass of wine before a visit in October 1990, but that he really hadn't, but said he did because she pressured him into saying it. (Testimony of Gary Stager).
On August 7, 1991, which was the fifth day of trial, while the Court Monitor was in the process of replaying a question asked of a witness, Dr. David Mantell, Father uttered an obscenity and stated he wanted this case adjourned. The Court called a brief recess in order to defuse what it considered to be a volatile atmosphere. When Court reconvened, and questioning of Dr. Mantell continued, Gary Stager interrupted and said that Dr. Mantell was crooked and that he wanted to leave. Based upon Father's demeanor, words and appearance, this Court believes that when in Court on August 7, 1991, the fifth day of the trial, he was clearly affected by the consumption of alcohol.
On September 12, 1991 and October 16, 1991, Father denied to DCYS Social Worker, Sherry Rautenberg, that he was continuing to drink alcohol beverages. On September 18, 1991, Chris, in a phone conversation, told his father twice that he didn't want to talk to him any more. At that point Father called the Plainfield Police and complained that Chris was being mistreated. The Police went to Chris' foster home and found that he was fine. Chris told the Police that he was angry and hurt inside because of his father. From the time Sherry Rautenberg became involved in this case on January 15, 1991 until October 16, 1991, nineteen visits were scheduled bi-weekly at the DCYS office in Willimantic. In accord with the recommendation of the boys' therapists, they are allowed to choose whether or not to have each scheduled visit. Both boys visited with Father on January 31, 1991, and both were present at a court-ordered parent-child psychological evaluation on May CT Page 1108 8, 1991. On February 28, 1991, Father cancelled the visit and DCYS cancelled it on March 14, 1991 because Father was in Blue Hills Hospital. Gregory visited on February 14, 1991, September 15, 1991, September 20, 1991 and October 10, 1991. No other visits were held. When Gregory went to the few visits that he did choose to attend, he asked Ms. Rautenberg how or if he could end the visit. She told him he could end the visit any time and return to the locked area of the DCYS office. He asked if his father could get through the office into the locked section. Greg was assured that his father could not. (Supplemental Social Study dictated July 24, 1991, Pages 12, 13, 14, and Social Study dictated October 16, 1991, Pages 17, 18, 19, 21 and 22).
Both boys are adoptable. (Testimony of Sherry Ratutenberg.)
IX. DISPOSITION (On facts as of October 30, 1991)
Inasmuch as the Court has found that statutory grounds (Failure to Rehabilitate and No ongoing Parent/Child Relationship) to terminate Gary Stager's parental rights exist, the Court must go on to consider whether it will be in the children's best interests to enter an order of termination based on facts existing on the final day of trial, October 30, 1991.
The Petitioner has proved by clear and convincing evidence that to be in Father's care would in all probability be harmful to the children.
It is clear that he is a chronic alcoholic who has repeatedly been confined in hospitals for detoxification and treatment of alcoholism, whose efforts at rehabilitation have been spotty and sporadic at best, and who has been frequently involved with the police as a result of his drinking, some of which incidents involved violent and bizarre behavior.
Father has not made any real progress in controlling his alcohol abuse and this failure has extended over a lengthy period of time; as a result he has not established a stable home or environment where he can properly and safely care for his sons. Even though he knew that such conduct might well lead to the termination of his parental rights, Father has rendered himself incapable of being able to have his sons returned to his care, and has made it necessary for the State to intervene in their lives so that their needs can be met.
 "The public policy of this state is: To protect children whose health and welfare may be adversely affected CT Page 1109 through injury and neglect;" (Conn. General Statutes, Section 17a-101(a)).
Gary Stager, due to his alcohol abuse, cannot meet the needs of his sons. His frequent alcoholic episodes, his inability to control his drinking and resulting behavior, documented over a considerable period, are reasonably predicted to continue into the foreseeable future. The violent and uncontrolled behavior which he exhibits when intoxicated would clearly be harmful to Chris and Greg. Placing them in such a situation would be exposing them to unreasonable and dangerous risks. It would be reckless, irresponsible and clearly dangerous to their well-being to permit them to be placed in the care of an actively-alcoholic father in order to prove whether they would suffer any harm, before deciding whether his parental rights should be terminated. The Court finds clearly and convincingly that Chris and Greg would be in physical danger during these alcoholic episodes which are likely to continue.
The Court finds, based upon the totality of the evidence, that despite repeated instances of medical intervention over the years, Gary so lacks the ability to control his behavior with respect to his abuse of alcohol, that he will not be able to safeguard his sons within the forseeable future.
Prior to determining whether to terminate parental rights, the Court is required to make six findings pursuant to Section 17a-112(d) of the Conn. General Statutes. The Court makes the following findings on those six factors:
1. DCYS set up placement for children in Maine with their maternal grandfather. Later, at Father's request, they moved the children back to Connecticut so he could see them more often; they arranged for therapy for both boys and stayed in touch with the therapists; they scheduled and attended visits, they prepared, explained and or made available, Agreements, Expectations and Treatment Plans in order to help Father toward reunification and they were careful to warn Father that they would seek Termination if he did not comply with expectations.
2. There were Court set expectations on August 25, 1989, August 3, 1990, and October 26, 1990; some of which were complied with, but overall there was not substantial compliance.
3. The feelings and emotional ties of the boys to Father have been growing progressively weaker and are now essentially negative. Greg has been with present foster parents only since CT Page 1110 June 17, 1991, and Chris with his present foster parents only since August 27, 1991, so feelings and emotional ties to them are uncertain.
4. As of the last day of the trial, Chris, having been born on October 23, 1980, was eleven years old; and Greg, having been born on January 5, 1983, was eight years and ten months old.
5. Father made some effort to adjust his circumstances by treatment, counselling, visitation, and occasional telephone calls to children, but he has been unable to stop drinking and has not made any real progress toward being able to be an adequate parent for either of these children.
6. There have been no unreasonable acts by anyone which have prevented Father from maintaining a relationship with Chris or Greg, nor were Father's economic circumstances a factor in the case.
Both children need the security of a stable and permanent home, and they should not be made to wait any longer than they already have for their father to become a legally adequate parent.
 "The well known deleterious effects of prolonged temporary placement on the child — makes the continuing review by DCYS in all — commitment cases imperative. Where appropriate, the agency must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible." In Re Juvenile Appeal (83-CD), 189 Conn. 276, 292 (1983).
The Court finds that the Petitioner has proved by clear and convincing evidence that it is in the best interest of Christopher S. and Gregory S. that the parental rights of Gary S. be terminated.
Accordingly, the Court orders that the parental rights of Gary S., in and to Christopher S. and Gregory S., are terminated, and that the Commissioner of DCYS be appointed statutory parent for both Christopher S. and Gregory S.
Richard A. Walsh, Judge